IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DANIEL FELIX )
    Petitioner )
     )
v. ) Case No. _____
     )
WARDEN, FCI DANBURY )
    Respondent )
     )

## PETITIONER'S MEMORANDUM IN SUPPORT OF SECTION 2241 PETITION AND REQUEST FOR A TEMPORARY RESTRAINING ORDER

Now comes the Petitioner, Daniel Felix, and hereby submits his Memorandum of Law in Support of Petitioner's Section 2241 Petition and Request for a Temporary Restrining Order and or Preliminary Injunction.

## I. FACTUAL BACKGROUND

The Petitioner is serving a term of incarceration at FCI Danbury. The FCI Danbury facility has informed Petitioner that he will be released to a Residential Reentry Center on June 24, 2025, as the Bureau of Prisons ("BOP") has determined he requires 150-days Residential Reentry Center placement under the Second Chance Act, based on a 5-factor individualized assessment of Petitioner's needs.

On April 1, 2025, the BOP issued a memoranda instructing BOP staff that all Residential Reentry Center (RRC) placement will be capped at 60 days even though the Second Chance Act caps the RRC placement at 12 months. The BOP informed all inmates that any inmate being released to a RRC after April 21, 2025 will have their RRC release date pushed back according, regardless of the mandatory 5-factor individualized assessment required under the Second Chance Act.

This change will move Petitioner's RRC placement date from June 24, 2025 to September 17, 2025.

II THE SECOND CHANCE ACT

The Second Chance Act, effective April 9, 2008, amended 18 U.S.C §3624(c). 18 U.S.C. §3624(c) now provides, in pertinent part:

> (1) In general. The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reetry of that prisoner into the community. Such conditions may include a community correctional facility.
>
> (2) Home confinement authority. The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months...
>
> (6) Issuance of regulations. The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Act of 2007, which shall ensure that placement in a community correctional facility [RRC] by the Bureau of Prisons is-
>
> (A) conducted in a manner consistent with section 3621(b) of this title;
>
> (B) determined on an individual basis; and
>
> (C) of sufficient duration to provide the greatest likelihood of successful reintegration into the community.

There are two statutes that govern the BOP's discretion regarding the placement of an inmate in a particular facility, including residential reentry centers. 18 U.S.C. §3621(b) and 18 U.S.C. §3624. United States v. Stone, 2025 U.S. LEXIS 26790 at 4 (ED Tex. Feb. 14, 2025).

Notably, "[i]n 2006, the ["BOP"] began referring to halfway houses which were formerly titled 'Community Corrections Centers'....as 'Residential Reentry Centers.'" Spears v. Carvajal, 2011 U.S. Dist. LEXIS 155817, 2011 WL 8492718, at 1 n.1 (E.D. Tex. 2011).

The Bureau of Prisons has explained that "[t]he primary purpose of RRC placement is to assist inmates in reintegrating into society following incarceration." Hayes v. Grayer, 2009 U.S. Dist. LEXIS 44150 at *9 (N.D. Ga. 2009).

Indeed, "[t]he purpose of the RRC is to facilitate inmate's reentry to the community after a period of incarceration, by providing a structured, supervised environment and support in job placement, counseling, and other services. The RRC helps inmates rebuild their ties to the community and find suitable employment and housing, while personnel supervise offenders' activities during this readjustment phase." Mulero-Algarin v. Martinez, 2011 U.S. Dist. LEXIS 115237 at fn. 1 (D.P.R. 2011). See also, Steck v. Chester, 393 Fed. Appx. 558, 560 (10th Cir. 2010)("the purpose of the RRC is to provide a transitional environment for inmates nearing the end of their sentences."); United States v. Johnson, 2021 U.S. Dist. LEXIS 171320 at *6 (S.D.N.Y. 2021)("The purpose of the halfway house is to 'provide programs that help inmates rebuild their ties to the community and reduce [] the likelihood that they will recidivate.")(quoting BOP, Completing the Transition, https://www.bop.gov/about/RRMs.jsp); United States v. Lewis, 400 F.Supp. 1046, 1048 (S.D.N.Y. 1975)("The purpose of a halfway house is to introduce a prisoner to outside life gradually, during daytime hours, so as to foster readjustment."); Tristano v. Fed. Bureau of Prisons, 2007 U.S. Dist. LEXIS 36025 at *4 (W.D. Wis. 2007)("Halfway houses are, as the name suggests, facilities that hold their charges in custody part of the time (usually nights and weekends) while releasing them during working hours, so they can begin employment and start the transition to a life of freedom").

Courts have held that "the purpose of the Second Chance Act of 2007...which was intended to 'reduce recidivism, increase public safety, and help state and local governments better address the growing population of ex-offenders returning to their communities.'" United States v. Aldeen, 792 F.3d 247, fn. 5 (2nd Cir. 2015)(quoting U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release, 2 n.11 (2010).

The Bureau of Prisons utilizes a five-factor review to determine the amount of time that a prisoner needs in a RRC in order for the prisoner to successfully reintegrate into society.

III. The Bureau of Prisons April 1, 2025 Memoranda

One April 1, 2025, the Bureau of Prison issued a memoranda that stated:

> The purpose of this memorandum is to provide updated guidance on managing Residential Reentry Center (RRC) populations in light of FY2025 budget constraints. Effective immediately, all inmates releasing to the community under Second Chance Act (SCA) authority after April 21, 2025, will have dates adjusted in order to bring the Residential Reentry Management Branch cost centers into alignment with the Federal Bureau of Prisons (Bureau) appropriated funding levels until further notice. This guidance will remain in place pending assessment of Bureau's future budgets. Placements will be adjusted as follows:
>
> SCA Placements
>
> 1. Effective immediately, all SCA pending placements (i.e., "in the pipeline") will be reduced to a maximum of 60 days, with two exceptions:
>
>    a. Inmates participating in the Residential Drug Abuse Program (RDAP) will have their release via 3621e CMPL transfer date reduced to allow for a 125-day placement in the RRC
>
>    b. Female inmates being released to the Northern Virginia-District of Columbia area. These individuals will be transferring to a firm-fixed price contract, and no cost savings will result from an adjustment of transfer date.

2. Inmates waiting to be referred under SCA must continue to have individualized assessments completed. However, consistent with 18 U.S.C. §3621(b), institutions shall consider bed availability. The Bureau's existing and projected budget constraints limit bed availability, meaning the Bureau cannot support placement beyond 60 days. As stated above, this guidance will remain in place pending assessment of the Bureau's future budgets. This applies to:

   a. Cases solely based on SCA eligibility.

   b. Cases where SCA time is in addition to First Step Act Time Credits (FTCs), (Earned and applied FTCs will not be changed, while SCA time will be limited to a maximum of 60 days).

Continuation of First Step Act Placements

Inmates who have earned and are eligible to apply FTCs to pre-release custody should continue to be referred to the community regardless of the amount of time earned.

Auto-Calculator Change
   Effective March 31, 2025, the auto-calculator will be updated to reflect a default to zero days for SCA placement days (instead of the previous 365 days).

Actions Required
   Residential Reentry Managers (RRMs) should reduce all pending SCA placements in the pipeline who have a date after April 21, 2025 (as stated above).

   RRMs should not reduce any referrals in which FTCs have been earned and applied to pre-release custody regardless of the amount of time in community.

   Institutions are instructed to continue all individualized assessments, ensuring referrals under SCA are no more than 60 days.

While this circumstance is regrettable, the Bureau must work to remain within congressionally appropriated funding levels.
Thank you for your cooperation and continued dedication to supporting the Bureau's mission. Your efforts are critical to ensuring the success of RRC programs during these challenging times.
Should you have any questions, please contact Melissa Arnold, Administrator, Correctional Programs Branch, or Bianca Shoulders, Administrator, Residential Reentry Management Branch.

BOP Memoranda, April 1, 2025.

Based on this BOP memoranda, the BOP is now capping the Second Chance Act at 60 days, rather than the 10 percent and or 12 months that the statute calls for. There is nothing in the BOP memoranda that would suggest that the BOP intends on making any meaningful individualized determination of an inmate's needs for placement at an RRC. To be sure, it is axiomatic that an inmate who has served 300 months in prison will not need the same 60 days RRC placement as an inmate who has served 24 months, as the former would clearly need more RRC placement time in order to successfully transition back into society.

"Nothing restricts the BOP from conferring discretion to various persons within the hierarchy of the institution. However, the Second Chance Act unequivocally requires that the BOP make an individualized determination of an inmate's needs in reaching its conclusion concerning the duration of a RRC placement." Krueger v. Martinez, 665 F.Supp.2d 477, 483 (M.D. Pa. 2009).

By limiting BOP staff the discretion to recommend a placement longer than 60 days, the April 1, 2025 memo denies Petitioner an individualized determination of his RRC placement, contrary to the Second Chance Act's amendments to 18 U.S.C. §3624(c). By instructing staff that pre-release placement needs can usually be accommodated by a placement of 60 days or less, the BOP has functionally placed a lid on the discretion that it wants its staff to exercise. The BOP memoranda makes clear that the BOP is categorically denying all RRC placement beyond 60 days for any inmate under the Second Chance Act, regardless of the results and needs demonstrated by an individualized assessment.

The Second Chance Act had a certain and unambiguous purpose. It is clear that by increasing the maximum placement period from six months to twelve months, "and by requiring the BOP to ensure that placements are long enough to provide the

greatest likelihood of successful reintegration, Congress intended that each inmate be considered for the full twelve months period of RRC placement with the only limitation being the application of the 18 U.S.C. §3621(b) factors." Krueger at 483.

The BOP's April 1, 2025 "memoranda add additional hurdles that find no support in the text of the Second Chance Act." Id. While a very small percentage of inmates may need not be placed in a RRC for longer than 60-days, it is not universally true that every prisoner will benefit from the same limitations.

The language in the BOP's April 1, 2025 memoranda "effectively chills staff discretion because staff are aware of the institutional preference for a RRC placement of [60 days] or less, a preference that is contrary to the apparent purpose of the Second Chance Act." Krueger, 665 F.Supp.2d at 483.

By depriving the initial decision maker the ability to recommend placement unfettered by a presumptive 60-day cap, the BOP significantly reduces the possibility of a truly individualized review that objectively determines the duration required "to provide the greatest likelihood of successful reintegration into the community." 18 U.S.C. §3624(c)(6)(C). Accordingly, because Petitioner's duration of RRC placement was determined pursuant to these impermissible limitations, the BOP abused its discretion in deciding that Petitioner's RRC placement would be limited to 60-days or less.

To be clear, the Petitioner is not asking this Court to determine the length of time necessary for the greatest likelihood of Petitioner's successful reintegration into the community. In accordance with 18 U.S.C. §3632(b), that task is best left to the discretion of the BOP. However, by instructing staff that pre-release placement needs can usually be accommodated by a placement of 60-days or less, and by denying staff the discretion to recommend a placement longer than

60 days, the BOP's April 1, 2025 memoranda constrain the discretion necessary to make this determination unfettered by an arbitrary ceiling. It is this ceiling that taints the BOP's decision to place Petitioner in a RRC for only 60-days or less. See, Krueger, at 484.

This Court cannot be entirely sure that the BOP made an individualized determination that 60-days or less was a sufficient length of time for Petitioner depsite the 60-day presumption contained in the memoranda or because of that presumption. The former is consistent with the BOP's legitimate exercise of discretion, the latter is an abuse of discretion because a presumptive 60-day cap finds no support in the text of the Second Chance Act.

Here, the policies elaborated in the April 1, 2025 BOP memoranda are in violation of regulatory guideposts included in the Second Chance Act's amendments to 18 U.S.C. §3624(c). The memoranda is in direct violation of 28 C.F.R. §570.22.

OTher courts have invalidated prior BOP policies on the grounds that it contravened the plain meaning of Section 3621(b). See Goldings v. Winn, 383 F.3d 17, 23-27 (1st Cir. 2004); Elwood v. Jeter, 386 F.3d 842, 846-47 (8th Cir. 2004).

Numerous courts have invalidated BOP policies limiting halfway house placement on various grounds, including statutory, Ex Post Facto, and APA grounds. See, e.g. Pinto v. Menifee, 2004 U.S. Dist. LEXIS 26071 (SDNY 2004)(rejecting policy on statutory and APA grounds)(collecting cases); Crowley v. Fed. Bureau of Prisons, 312 F.Supp.2d 453 (SDNY 2004)(rejecting policy on statutory, APA, and Ex Post Facto grounds); Solomon v. Zenk, 2004 U.S. Dist. LEXIS 22136 (E.D.N.Y. 2004) (policy contrary to plain meaning of section 3621(b) and section 3624(c) as well as sound public policy).

It is clear by the BOP's April 1, 2025 memorandum that the decision to curtail the Second Chance Act is arbitrary and capricious. "'Arbitrary and capricious' is defined as willful and unreasonable action without consideration of or in disregard of the facts." Greene v. Tex. Comm'n for the Blind, 1995 U.S. App. LEXIS 42068 at 3 (5th Cir. 1995). "'Arbitrary' refers to behavior that is irrational and not done according to reason or judgment." Id. at 3. See, Fulmer v. Connors, 665 F.Supp. 1472 at fn. 16 (N.D. Ala. 1987)("arbitrary...means in an 'arbitrary' manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic.")

The BOP memoranda states that the decision to curtail the Second Chance Act was based on financial constraints on the BOP. However, that rationale is illogical and contrary to the BOP's own facts since the Bureau of Prisons has stated that it costs less to house an inmate at a Residential Reentry Centerr than at a federal prison facility. See EXHIBIT 1 - Cost of Incarceration Fee, 89 FR 97072 (Dec. 6, 2024)(stating that the average cost to house an inmate in a prison is $120.80 per day while the cost to house an inmate at a RRC is $113.53 per day).

Moreover, the BOP memoranda does not address the prison overcrowding that will occur as a result of more inmates being housed at BOP prison facilities since those inmates will not be be released to RRC facilities, except for up to 60 days, which completely ignores the Second Chance Act's mandatory language that the BOP shall place an inmate in a RRC for up to 12 months, not 60 days, based on a 5-factor individualized review process. The BOP is unequivocally violating the Second Chance Act and Congress' directive.

## IV. TEMPORARY RESTRAINING ORDER - PRELIMINARY INJUNCTION

The Petitioner requests that the Court issue a temporary restraining order and or a preliminary injunction barring the Bureau of Prisons from 1) altering the RRC placement date of inmates who have already received their RRC release dates; and 2) curtailing the Second Chance Act by capping the amount of possible RRC placement days to 60 days or less.

A temporary restraining order (TRO) is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001)(the standard for issuing a TRO is "substantially identical" to the standard for issuing a preliminary injunction).

A petitioner seeking a TRO must establish: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." Winter, 555 U.S. at 20. See also, Smith v. Halstead, 2024 U.S. Dist. LEXIS 183234 at 6 (S.D.N.Y. Oct. 3, 2024).

Alternatively, a petitioner who shows only that there are "serious questions going to the merits" can satisfy the Winter requirements by establishing that the "balance of hardships [] tips sharply towards [the petitioner]" and that the remaining two Winter factors are met. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

Here, Petitioner and others will suffer irreparable harm because the BOP is now limiting the amount of time for successful reentry under the Second Chance Act to a mere 60-days, regardless of any individual inmate's actual needs for a

"reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. §3624(c). The BOP recently determined that Petitioner required 150-days RRC placement to ensure a successful reentry. However, now the BOP memoranda states that Petitioner will only receive 60-days RRC placement, regardless of his actual RRC needs. This all be assures the Petitioner of an unsuccessful reentry into society. Importantly, the Government cannot point this Court to any factual basis that would now support that a 60-day RRC placement is sufficient under the Petitioner's circumstances, especially since the Petitioner's circumstances have not changed at all since the BOP determined that he required a 150-day placement in a RRC for a successful reentry back into the community. Nothing in the BOP's April memoranda addresses the Second Chance Act's purpose of "reduc[ing] recidivism" and "increas[ing] public safety" United States v. Aldeen, 792 F.3d 247, fn. 5 (2nd Cir. 2015). It would appear that the BOP's April 2025 memoranda will actually increase recidivism and decrease public safety. Therefore, a temporary restraining order or a preliminary injunction is absolutely necessary to ensure that is not the result.

## V. EXHAUSTION

Although Section 2241 does not contain an explicit statutory exhaustion requirement, Courts of Appeals have required a federal inmate to exhaust their administrative remedies before filing a Section 2241 petition. See, Moscato v. Fed. Bureau of Prisons, 98 F.3d 757, 760 (3rd Cir. 1996)("Federal prisoners are ordinarily required to exhaust their administrative remedies before petitioning for a writ of habeas corpus pursuant to §2241").

Exhaustion is required "for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative automony." Moscato, at 761-762.

"Exhaustion is not required when it would not promote these goals." King v. Camp, 2025 U.S. Dist. LEXIS 12508 at 8 (M.D. Pa. Jan. 24, 2025). See, Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3rd Cir. 1981)("The exhaustion doctrine will not be applied...when none of the basic goals (of the doctrine) would be served").

Courts in the Second Circuit have held that the failure to exhaust constitutes a procedural default that bars judicial review unless the petitioner makes a showing of cause and prejudice. Atkinson v. Linaweaver, 2013 U.S. Dist. LEXIS 142717, 2013 WL 5477576, at *1 (S.D.N.Y. 2013). Such a failure may be excused for cause "when such exhaustion would be futile or where the agency has predetermined the issue before it." Garcia v. Shanahan, 615 F.Supp.2d 175, 180 (S.D.N.Y. 2009). See also, Brown v. Warden Canaan USP, 763 F. App'x 296, 297 (3rd Cir. 2019)("For example, exhaustion may be excused where it 'would be futile' if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable harm").

Third Circuit has concluded that exhaustion is not required in the current context because it "would be futile," inasmuch as the issue is not "the application of the BOP regulations, but their validity," and, therefore, "the purpose of exhaustion would not be served...by requiring [a federal prisoner] to exhaust their administrative remedies." Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 239 n.2 (3rd Cir. 2005). See, Elwood v. Jeter, 386 F.3d 842, 844 n.1 (10th Cir. 2004)(noting that "the government waived the exhaustion requirement because

-12-

it concedes [that] continued use of the grievance procedure to contest the validity of the BOP's new policy would be futile"). <u>See also</u>, <u>Hacker v. Fed. Bur. of Prisons</u>, 2006 U.S. Dist. LEXIS 62525, at 19 (E.D. Mich. 2006)(excusing administrative exhaustion because "[i]f the rulings of the First, Second, Third, and Eighth Circuits have not persuaded the BOP to rescind the regulations, it is not likely that an adnimistrative remedy by a federal inmate would cause the BOP to change its position," and noting "that the BOP's litigation position evidences a determined adherence to the policy embodied in the regulation").

Importantly, the BOP lacks an emergency review process. Here, the BOP policy cannot be changed by the Warden, Regional Director, or General Counsel, and as such, the BOP administrative remedy process cannot provide any relief at all. Only the BOP Director can provide relief, which would require the BOP to rescind the current policy that completely curtails the statutory Second Chance Act.

The new BOP policy violates the Second Chance Act as well as the Ex Post Facto doctrine. The policy is illogical and completely ignores the mandatory language of the Second Chance Act.

## CONCLUSION

The BOP April 1, 2025 policy violates the Second Chance Act. The Policy completely ignores the mandatory 5-factor individualized review of an inmate's RRC needs to ensure a successful reentry into society. The BOP policy will increase recidivism thereby endangering the public. The policy does not consider the public's safety. The policy does not consider any inmate's individualized needs for placement in a Residential Reentry Center. As such, the Court should find that the new BOP policy must be invalidated and that a preliminary injunction or temporary restraining order is required to ensure the status quo in this matter.

Respectfully Submitted,

*Daniel Felix*

Daniel Felix
Reg. No. 99392-509
FCI Danbury
33½ Pembroke Road
Danbury, CT 06811

## CERTIFICATE OF SERVICE

I, Daniel Felix, hereby certify that I mailed a copy of this document to the U.S. Attorney's Office, 157 Church Street, 23rd Floor, New Haven, CT 06510 on April 10, 2025.

*Daniel Felix*

Daniel Felix

<u>EXHIBIT 1</u>

should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *United States of America* v. *BCP Ingredients, Inc.* Civ. No. 3:24–cv–5094 (W.D. Mo.), D.J. Ref. No. 90–5–2–1–12805. All comments must be submitted no later than thirty (30) days after the publication date of this notice. Comments may be submitted either by email or by mail:

| To submit comments: | Send them to: |
|---|---|
| By email ....... | pubcomment-ees.enrd@usdoj.gov. |
| By mail ......... | Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044–7611. |

During the public comment period, the consent decree may be examined and downloaded at this Justice Department website: *https://www.justice.gov/enrd/consent-decrees*. If you require assistance accessing the consent decree, you may request assistance by email or mail to the addresses provided above for submitting comments.

**Kathryn C. Macdonald,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*
[FR Doc. 2024–28710 Filed 12–5–24; 8:45 am]
**BILLING CODE 4410–15–P**

## DEPARTMENT OF JUSTICE

### Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act and Formerly Utilized Sites Remedial Action Program

On December 2, 2024, the Department of Justice lodged a proposed Consent Decree with the United States District Court for the Eastern District of Missouri in the lawsuit entitled *United States* v. *Cotter Corporation (N.S.L.) and Norfolk Southern Railway Company,* Civil Action No. 24–cv–1593.

The United States filed this lawsuit under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Formerly Utilized Sites Remedial Action Program (FUSRAP) for response costs incurred, and to be incurred, by the United States Army Corps of Engineers (the Corps) and Department of Defense for their removing contamination from uranium ore or residue processing materials at certain portions of the North St. Louis County Superfund Site in Missouri. Under the proposed Consent Decree, Cotter Corporation, Norfolk Southern Railway Company, and the United States will pay a combined total of nearly $164,000,000 in past and future response costs for costs associated with the above activities. In return, the proposed Consent Decree provides Cotter, Norfolk Southern, and the United States with a covenant not to sue or take administrative action under section 107(a) of CERCLA for any costs associated with the above activities at the North St. Louis County Site, as well as contribution protection under section 113(f)(2) of CERCLA.

The publication of this notice opens a period for public comment on the proposed Consent Decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *United States* v. *Cotter Corporation (N.S.L.) and Norfolk Southern Railway Company,* D.J. Ref. No. 90–11–2–08259/3. All comments must be submitted no later than thirty (30) days after the publication date of this notice. Comments may be submitted either by email or by mail:

| To submit comments: | Send them to: |
|---|---|
| By e-mail ...... | pubcomment-ees.enrd@usdoj.gov. |
| By mail ......... | Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044–7611. |

During the public comment period, the proposed Consent Decree may be examined and downloaded at this Justice Department website: *https://www.justice.gov/enrd/consent-decrees*. If you require assistance accessing the proposed Consent Decree, you may request assistance by email or by mail to the addresses provided above for submitting comments.

**Kathryn C. Macdonald,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*
[FR Doc. 2024–28520 Filed 12–5–24; 8:45 am]
**BILLING CODE 4410–15–P**

## DEPARTMENT OF JUSTICE

### Bureau of Prisons

### Annual Determination of Average Cost of Incarceration Fee (COIF)

**AGENCY:** Bureau of Prisons, Justice.
**ACTION:** Notice.

**SUMMARY:** Pursuant to regulations, the Bureau of Prisons publishes the Fiscal Year (FY) 2023 Cost of Incarceration Fee (COIF) for Federal inmates.
**DATES:** December 6, 2024.
**ADDRESSES:** Office of General Counsel, Federal Bureau of Prisons, 320 First Street NW, Washington, DC 20534.
**FOR FURTHER INFORMATION CONTACT:** Daniel J. Crooks III, Assistant General Counsel/Rules Administrator, Federal Bureau of Prisons, at the address above or at (202) 353–4885.
**SUPPLEMENTARY INFORMATION:** Title 28 of the Code of Federal Regulations, part 505, allows for assessment of a fee to cover the average cost of incarceration for Federal inmates. We calculate the cost of incarceration fee (COIF) by dividing the number representing the Bureau of Prisons (Bureau) facilities' monetary obligation (excluding activation costs) by the number of inmate-days incurred for the fiscal year, and then by multiplying the quotient by the number of days in the fiscal year.

Based on FY 2023 data, the average annual COIF for a Federal inmate housed in a Bureau or non-Bureau facility in FY 2023 was $44,090 ($120.80 per day). The average annual COIF for a Federal inmate housed in a Residential Reentry Center for FY 2023 was $41,437 ($113.53 per day). (Please note: There were 365 days in FY 2023.)

**James Wills,**
*Assistant Director/General Counsel, Federal Bureau of Prisons.*
[FR Doc. 2024–28743 Filed 12–5–24; 8:45 am]
**BILLING CODE 4410–05–P**

## DEPARTMENT OF LABOR

### Mine Safety and Health Administration

### Petition for Modification of Application of Existing Mandatory Safety Standards

**AGENCY:** Mine Safety and Health Administration, Labor.
**ACTION:** Notice.

**SUMMARY:** This notice is a summary of a petition for modification submitted to the Mine Safety and Health Administration (MSHA) by Peabody Midwest Mining, LLC.
**DATES:** All comments on the petition must be received by MSHA's Office of Standards, Regulations, and Variances on or before January 6, 2025.
**ADDRESSES:** You may submit comments identified by Docket No. MSHA–2024–0089 by any of the following methods:
1. *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the