# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

DANIEL FELIX,
*Petitioner*,

v.

WARDEN, FCI DANBURY,
*Respondent.*

No. 3:25-cv-605 (VAB)

## RULING AND ORDER ON MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER

Daniel Felix ("Petitioner") has filed a petition for a writ of habeas corpus under 28 U.S.C § 2241. Petition For Writ of Habeas Corpus, ECF No. 1 (Apr. 14, 2025) ("Petition"). Mr. Felix has moved for an *ex parte* temporary restraining order ("TRO") and/or a preliminary injunction to enjoin FCI Danbury from implementing an April 1, 2025 policy capping Residential Reentry Center ("RRC") Placement at sixty days. Mot. for TRO, ECF No. 3 (Apr. 14, 2025) ("Mot.").

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Mr. Felix is a federal prisoner incarcerated at FCI Danbury. Mot. at 1. Mr. Felix allegedly was scheduled to be released to 150-days of RRC Placement on June 24, 2025. *Id.*

On April 1, 2025, the Bureau of Prisons ("BOP") allegedly issued a memorandum limiting RRC placement to sixty days for any inmate released after April 21, 2025 (the "April 2025 Memorandum"). *Id.* Mr. Felix alleges that the memoranda stated the following:

> The purpose of this memorandum is to provide updated guidance on managing Residential Reentry Center (RRC) populations in light of FY2025 budget constraints. Effective immediately, all inmates releasing to the community under Second Chance Act (SCA) authority after April 21, 2025, will have dates adjusted in order to

bring the Residential Reentry Management Branch cost centers into alignment with the Federal Bureau of Prisons (Bureau) appropriated funding levels until further notice. This guidance will remain in place pending assessment of Bureau's future budgets. Placements will be adjusted as follows:

SCA Placements

1. Effective immediately, all SCA pending placements (i.e., "in the pipeline") will be reduced to a maximum of 60 days, with two exceptions:
a. Inmates participating in the Residential Drug Abuse Program (RDAP) will have their release via 3621e CMPL transfer date reduced to allow for a 125-day placement in the RRC
b. Female inmates being released to the Northern Virginia-District of Columbia area. These individuals will be transferring to a firm-fixed price contract, and no cost savings will result from an adjustment of transfer date.

2. Inmates waiting to be referred under SCA must continue to have individualized assessments completed. However, consistent with 18 U.S.C. §3621(b), institutions shall consider bed availability. The Bureau's existing and projected budget constraints limit bed availability, meaning the Bureau cannot support placement beyond 60 days. As stated above, this guidance will remain in place pending assessment of the Bureau's future budgets. This applies to: a. Cases solely based on SCA eligibility.
b. Cases where SCA time is in addition to First Step Act Time Credits (FTCs), (Earned and applied FI'Cs will not be changed, while SCA time will be limited to a maximum of 60 days).

Continuation of First Step Act Placements

Inmates who have earned and are eligible to apply FICs to pre-release custody should continue to be referred to the community regardless of the amount of time earned.

Auto-Calculator Change
Effective March 31, 2025, the auto-calculator will be updated to reflect a default to zero days for SCA placement days (instead of the previous 365 days).Actions Required

Residential Reentry Managers (RRMs) should reduce all pending SCA placements in the pipeline who have a date after April 21, 2025 (as stated above).
RRMs should not reduce any referrals in which FTCs have been earned and applied to pre-release custody regardless of the amount of time in community.

> Institutions are instructed to continue all individualized assessments, ensuring referrals under SCA are no more than 60 days.
>
> While this circumstance is regrettable, the Bureau must work to remain within congressionally appropriated funding levels.
> Thank you for your cooperation and continued dedication to supporting the Bureau's mission. Your efforts are critical to ensuring the success of RRC programs during these challenging times.
> Should you have any questions, please contact Melissa Arnold, Administrator, Correctional Programs Branch, or Bianca Shoulders, Administrator, Residential Reentry Management Branch.

Mot. at 4–5.

As a result of this memorandum, Mr. Felix alleges that his RRC placement date has been moved from June 24, 2025 to September 17, 2025. Mot. at 1.

## II.    STANDARD OF REVIEW

"[T]he same legal standard governs motions for temporary restraining orders and motions for preliminary injunctions." *Lazor v. Univ. of Connecticut*, 560 F. Supp. 3d 674, 677 (D. Conn. 2021). As a result, a party seeking a temporary restraining order must show "that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Id.* at 677–78 (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (alterations in original)). To demonstrate a likelihood of success on the merits, "[a] movant . . . need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (citations omitted), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

"The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (quoting *Pan Am.*

*World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter*, 306 F.2d 840, 842 (2d Cir.1962)).

"The court may issue a temporary restraining order without written or oral notice to the adverse

party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show

that immediate and irreparable injury, loss, or damage will result to the movant before the

adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any

efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P.

65(b)(1); *see Standard Microsystems Corp. v. Texas Instruments, Inc.*, 916 F.2d 58, 62 (2d Cir.

1990) ("Where speed is needed, the rules of procedure provide for temporary restraining orders,

even without notice, to prevent irreparable harm." (citing Fed. R. Civ. P. 65)). "The restrictions

on the availability of *ex parte* temporary restraining orders imposed by Rule 65(b) are stringent

and must be scrupulously honored*." Fed. Trade. Comm'n v. Grand Teton Pros., LLC*, 2019 WL

4439501, at *2 (D. Conn. 2019) (internal quotation marks and citations omitted) (citing *Granny*

*Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of*

*Alameda Cty.*, 415 U.S. 423, 438-39 (1974); *Austin v. Altman*, 332 F.2d 273, 275 (2d Cir. 1964)).

## III.    DISCUSSION

"A writ of habeas corpus under § 2241 is available to a federal prisoner who does not

challenge the legality of his sentence, but challenges instead its execution subsequent to his

conviction." *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001) (citation

omitted). A federal prisoner bringing such challenge "must satisfy his burden of proof by a

preponderance of the evidence." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)

The Second Chance Act of 2007 modified 18 U.S.C. § 3624(c)(1) to allow a federal

inmate to serve up to one year of his term of imprisonment in pre-release custody, such as home

confinement, a community correctional facility, or an RRC. *See The Daraio v. Lappin*, No.

3:08CV1812 (MRK), 2009 WL 303995, at *5 (D. Conn. Feb. 9, 2009), *adhered to on reconsideration*, No. 3:08CV1812(MRK), 2009 WL 712363 (D. Conn. Mar. 13, 2009); *see also* 18 U.S.C. § 3624(c)(1) ("The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community."). "[T]he BOP has discretion to determine whether a prisoner receives prerelease custody placement and how much time the prisoner receives within the twelve-month maximum period." *Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 209 (D. Conn. Nov. 18, 2024) (citing 18 U.S.C. § 3621(b)).

"In exercising its discretion over inmate placements and transfers, the BOP must consider five individualized factors enumerated in 18 U.S.C. § 3621(b)." *Johansson v. Strada*, No. 12-CV-5296 (ARR), 2012 WL 6093534, at *2 (E.D.N.Y. Dec. 7, 2012); *see* 18 U.S.C. § 3624(c)(4) ("Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621."); *id.* § 3624(c)(6) ("The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Reauthorization Act of 2018, which shall ensure that placement in a community correctional facility by the Bureau of Prisons is . . . (A) conducted in a manner consistent with section 3621(b) of this title; (B) determined on an individual basis; and (C) of sufficient duration to provide the greatest likelihood of successful reintegration into the community."); 28 C.F.R. § 570.22 ("Inmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. section 3621(b), determined on an individual basis, and of sufficient duration to provide the greatest likelihood of successful reintegration into the community, within the time-frames set forth in this part.").

These factors include:

    (1) the resources of the facility contemplated;
    (2) the nature and circumstances of the offense;
    (3) the history and characteristics of the prisoner;
    (4) any statement by the court that imposed the sentence
          (A) concerning the purposes for which the sentence to
          imprisonment was determined to be warranted; or
          (B) recommending a type of penal or correctional facility
          as appropriate; and
    (5) any pertinent policy statement issued by the Sentencing
    Commission[.]"

18 U.S.C. § 3621(b). In addition, under Section 3621(b), the BOP is directed to "place the

prisoner in a facility as close as practicable to the prisoner's primary residence" although such

designation is "subject to bed availability, the prisoner's security designation, the prisoner's

programmatic needs, the prisoner's mental and medical health needs, any request made by the

prisoner related to faith-based needs, recommendations of the sentencing court, and other

security concerns." *Id.*

    Mr. Felix argues that the April 2025 Memorandum violates the Second Chance Act

because it denies him an individualized determination of his RRC placement. Mot. at 6. First,

relying on *Krueger v. Martinez*, 665 F.Supp.2d 477, 483 (M.D. Pa. 2009), Mr. Felix argues that

Congress intended for inmates to be considered for the full twelve-month period, and by placing

a sixty-day limitation on pre-release placement, BOP is "chilling staff discretion" through

prohibiting staff from making an individualized determination "unfettered by an arbitrary

ceiling." *Id*. at 6–8. Second, he contends that the April 2025 Memorandum violates "regulatory

guideposts included in the Second Chance Act's amendments to 18 U.S.C. §3624(c)" and "is in

direct violation of 28 C.F.R. §570.22." *Id*. at 8. Third, he argues that the "decision to curtail the

Second Chance Act is arbitrary and capricious." *Id*. at 9.

    The Court disagrees, at least at this early stage.

As an initial matter, Mr. Felix's motion relies extensively on *Krueger v. Martinez*, where the court found that the BOP's April 14, 2008 and November 14, 2008 memoranda violated the Second Chance Act because it required "additional hurdles," such as the consent of the Regional Director, for BOP staff to order a RRC placement of more than six months. *See* 665 F.Supp.2d at 483 ("By depriving the initial decision maker of the ability to recommend placement unfettered by a presumptive six month cap, the BOP significantly reduces the possibility of a truly individualized review that objectively determines the duration required 'to provide the greatest likelihood of successful reintegration into the community.'" (quoting 18 U.S.C. § 3624(c)(6)(C))). This opinion, however, is not binding on this Court and its conclusion has been rejected by a majority of courts, including courts in this Circuit and within that court's own district, which have upheld the legality of the same BOP memoranda. *See McDonald v. Obama*, No. CIV.1:10-CV-379, 2010 WL 1526443, at *8 (M.D. Pa. Mar. 15, 2010), *report and recommendation adopted*, No. CIV.1:CV-10-0379, 2010 WL 1526447 (M.D. Pa. Apr. 15, 2010) ("The majority view, reflected in numerous trial and appellate court decisions, holds that the Bureau of Prisons' requirement of regional director approval, and the agency's stated view that many inmates can have their needs meet through 180–day RRC placements, do not violate the Act." (collecting cases)); *Bernard v. Roal*, 716 F. Supp. 2d 354, 360 (S.D.N.Y. 2010) ("[C]ourts have regularly rejected claims that the BOP could not properly create a presumption that a six-month placement is sufficient. . . . The Court recognizes that two cases have reached a contrary result." (citing *Krueger*, 665 F.Supp.2d at 482–83; *and Strong v. Schultz*, 599 F.Supp.2d 556, 563 (D.N.J. 2009), and collecting cases rejecting the conclusions in *Krueger* and *Strong*)).

Moreover, while Mr. Felix's argument that the April 2025 Memorandum violates the Second Chance Act by failing to allow staff to consider the full twelve-month period permitted

under Section 3624 may be a viable claim, *see Owusu-Sakyi v. Terrell*, No. 10-CV-507 KAM, 2010 WL 3154833, at *3 (E.D.N.Y. Aug. 9, 2010) ("Several courts have found that the 2008 BOP Rule complies with the Second Chance Act because it tracks the statute's requirements of individualized determinations and allows for end-of-sentence RRC placement for the full 12 month period permitted by statute."), he fails to demonstrate "the probability of his prevailing is better than [the] fifty percent" necessary for the Court to order an *ex parte* TRO. *Abdul Wali*, 754 F.2d at 1025.

Contrary to Mr. Felix's assertions that the April 2025 Memorandum violates applicable law, the express language of Sections 3624(c) and 3621(b) authorizes BOP to consider the policy considerations cited in the memorandum. The April 2025 Memorandum states the following:

> Inmates waiting to be referred under SCA must continue to have individualized assessments completed. However, consistent with 18 U.S.C. §3621(b), institutions shall consider bed availability. The Bureau's existing and projected budget constraints limit bed availability, meaning the Bureau cannot support placement beyond 60 days.

Mot. at 5.

As discussed above, Section 3624(c) states that it should not be "construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621," 18 U.S.C. § 3624(c)(4), and the BOP's regulation promulgated under the Act, 28 C.F.R. § 570.22, instructs that "[i]nmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. section 3621(b)[.]" Under Section 3621(b), the BOP must consider factors such as "the resources of the facility contemplated," and the statute specifies that the BOP's designations are "subject to bed availability." *See* 18 U.S.C. § 3621(b); *see also id.* ("The Bureau of Prisons . . . shall, subject to bed availability. . . place the prisoner in a facility as close as practicable to the prisoner's primary residence."). Furthermore, Section 3624(c)(1)'s language is

permissive and indicates that Second Chance Act placements should be implemented "to the extent practicable." 18 U.S.C. § 3624(c)(4). The plain language of the Second Chance Act, therefore, suggests that BOP retains the discretion to consider practical resource limitations such as limited bed availability due to budget constraints in its designation of RRC placements. *See also* April 2025 Memorandum, Mot. at 5 ("While this circumstance is regrettable, the Bureau must work to remain within congressionally appropriated funding levels.").

In addition, the April 2025 Memorandum expressly states that an individualized determination is still required, consistent with 28 C.F.R. § 570.22. *See* Mot. at 5 ("Inmates waiting to be referred under SCA must continue to have individualized assessments completed); *id.* ("Institutions are instructed to continue all individualized assessments, ensuring referrals under SCA are no more than 60 days."); *see also* 28 C.F.R. § 570.22 ("Inmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. section 3621(b), determined on an individual basis . . .").

While Mr. Felix cites several cases where courts "invalidated prior BOP policies on the grounds that it contravened the plain meaning of Section 3621(b)," he fails to show that the reasoning of those cases is applicable to the April 2025 Memorandum. *See* Mot. at 8 (citing *Goldings v. Winn,* 383 F.3d 17, 23–27 (1st Cir. 2004); *Elwood v. Jeter*, 386 F.3d 842, 846-47 (8th Cir. 2004); *Pinto v. Menifee*, No. 04 CIV.5839 MHD, 2004 WL 3019760, 2004 U.S. Dist. LEXIS 26071, (S.D.N.Y. Dec. 23, 2004); *Crowley v. Fed. Bureau of Prisons*, 312 F.Supp.2d 453 (S.D.N.Y. 2004); *Solomon v. Zenk*, No. 04-CV-2214, 2004 WL 2370651, 2004 U.S. Dist. LEXIS 22136 (E.D.N.Y. Oct. 22, 2004)).

First, these cases were decided before the enactment of the Second Chance Act, and concerned a BOP policy adopted in December 2002 that limited the term of pre-release

community corrections center ("CCC") placements to the last ten percent of the sentence being served. Several courts found that this policy, and a similar policy adopted in February 2005, violated Section 3621(b). *See, e.g., Levine v. Apker*, 455 F.3d 71, 75 (2d Cir. 2006) ("A cavalcade of habeas petitions challenging the December 2002 Policy followed. The First and Eighth Circuits, as well as many district courts, found the policy contrary to the plain meaning of § 3621(b), which they read—as had the BOP previously—to give the BOP discretionary authority to place federal inmates in CCCs at any time during their prison term."); *see also id.* at 87 ("By fusing the entire placement analysis with respect to CCCs into a single category grounded on the length of an inmate's remaining sentence, the February 2005 Rule eliminated from consideration each of the statutory factors that turn, instead, on the inmate's specific history. . . Accordingly, and like our sister circuits, we find that [the February 2005 Rule] is an improper exercise of the BOP's rulemaking authority."). Later, in 2008, Congress enacted the Second Chance Act, which "modified Title 18 U.S.C. § 3624(c) in three notable ways: (1) it doubled the maximum prerelease RRC placement period from 6 to 12 months, (2) it required the BOP to make RCC placement decisions on an individual basis, and (3) it required the BOP to ensure that, consistent with the factors in Section 3621(b), the duration of the RRC placement period gives the inmate the greatest likelihood of successful community reintegration." *Owusu-Sakyi*, 2010 WL 3154833, at *2.

Second, even if the rationale of these cases apply to BOP policies implemented after the enactment of the Second Chance Act and the modification of Section 3624(c), the reasoning in those cases can be distinguished here. Unlike the memoranda at issue in those cases, which permanently limited all pre-release CCC placements to the last ten percent of the inmate's

10

sentence, the April 2025 Memorandum appears to be a temporary, practical limitation that relies upon the statutory factors listed in Section 3621(b).

Those factors, as discussed above, allow for BOP to consider resource limitations, and the April 2025 Memorandum specifies that the sixty-day limitation imposed is not a permanent cap on potential RRC placement time, but rather "will remain in place pending assessment of the Bureau's future budgets." Mot. at 5. Significantly, the memoranda specifies that the sixty-day limitation does not apply to inmates eligible for RRC placement in facilities that are within the BOP's budget constraints and where longer RRC placements are feasible.[1] *See* Mot. at 4 (noting "two exceptions" to the 60-day maximum for SCA placements including "[f]emale inmates being released to the Northern Virginia-District of Columbia area" because "[t]hese individuals will be transferring to a firm-fixed price contract, and no cost savings will result from an adjustment of transfer date"). Thus, rather than imposing a permanent extratextual limitation that contradicts the maximum term provided for by statute, the April 2025 Memorandum appears to be a temporary measure "to bring the Residential Reentry Management Branch cost centers into alignment with the Federal Bureau of Prisons (Bureau) appropriated funding levels until further notice[,]" because RRC placement beyond 60 days is allegedly not practicable for most BOP inmates at this time. Mot. at 4; *cf. Goldings*, 383 F.3d at 23 ("Under § 3624(c), the BOP *must* ensure placement under pre-release conditions except where no such placement is practicable." (emphasis in original)).

---

[1] Mr. Felix alleges facts that call into question the BOP's proposed justification for its policy. *See* Mot. at ("[T]hat rationale is illogical and contrary to the BOP's own facts since the Bureau of Prisons has stated that it costs less to house an inmate at a Residential Reentry Centerr [sic] than at a federal prison facility"). Given the analysis above, indicating that the April 2025 Memorandum likely complies with the requirements of Section 3621(b), however, Mr. Felix fails to show that *ex parte* relief is warranted at this stage before the Defendant has been given an opportunity to respond to these factual allegations. *See Granny Goose Foods, Inc.*, 415 U.S. at 438–39 ("The stringent restrictions imposed by . . . Rule 65, on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute").

Accordingly, because Mr. Felix fails to show a likelihood of success on the merits at this stage, the Court denies his request for a TRO invalidating the April 2025 Memorandum.[2]

## IV.  CONCLUSION

For the foregoing reasons, the motion for an *ex parte* temporary restraining order is **DENIED**.

Unlike a TRO, notice to the Defendant is required to issue a preliminary injunction. Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party."). Because, however, the Court has determined that Mr. Felix fails to show a likelihood of success on the merits, the Court **DENIES** his motion for a preliminary injunction without prejudice to renewal after the Defendant has been served.

**SO ORDERED** at New Haven, Connecticut, this 9th day of May, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[2] Mr. Felix also argues that exhaustion of administrative remedies is not required because "[here] the BOP policy cannot be changed by the Warden, Regional Director, or General Counsel, and as a result, the BOP administrative remedy process cannot provide any relief at all." Mot. at 13. Because the Court has determined that Mr. Felix fails to show a likelihood of success on the merits of his habeas claim sufficient to warrant an *ex parte* TRO, the Court need not and does not address whether he failed to exhaust any available administrative remedies.